# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

FITZ VANDERBURGH and MAULIN          :
VANDERBURGH,                         :
      Plaintiffs,           :
                                 :
                                 :
     -vs-                :
                                 :
NATIONAL RAILROAD PASSENGER          :
CORPORATION,                         :     Civil No.  3:06cv585 (PCD)
    Defendant/Third-Party Plaintiff, :
                                 :
     -vs-                :
                                 :
O&G INDUSTRIES,                      :
    Third-Party Defendant.       :

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs, alleging negligence and recklessness, bring this action to recover for injuries they sustained as a result of a railroad accident which occurred on June 16, 2004. Defendant/Third-Party Plaintiff National Railroad Passenger Corporation ("Amtrak") filed a Third-Party Complaint against Third-Party Defendant O&G Industries ("O&G") seeking indemnification. Pending are three motions for summary judgment. O&G moves, pursuant to Federal Rule of Civil Procedure 56, for the entry of summary judgment on Amtrak's complaint, arguing that O&G has no obligation to indemnify Amtrak in this case. Amtrak moves, pursuant to Rule 56, for an order dismissing Plaintiffs' claims against Amtrak for punitive damages. Amtrak also moves, pursuant to Rule 56, for summary judgment on its complaint against O&G and an order directing O&G to defend Amtrak in this action and to indemnify Amtrak for any sums it shall be obligated to pay Plaintiffs in this action. For the reasons that follow, O&G's Motion for Summary Judgment [Doc. No. 33] is **granted**, Amtrak's Motion for Summary

Judgment against Plaintiffs [Doc. No. 39] is **denied**, and Amtrak's Motion for Summary

Judgment against O&G [Doc. No. 46] is **granted in part and denied in part**.  Moreover,

Amtrak and O&G's Motions to Expedite consideration of the summary judgment motions [Doc.

Nos. 54, 55, 62] are **granted**.

## I.      BACKGROUND

This case arises out of a railroad accident which occurred on June 16, 2004.  Three

consolidated actions were originally filed as a result of that accident; the lead case was David E.

Roberts v. National Railroad Passenger Corporation, 3:04cv1318 (PCD).[1]  In those actions, the

plaintiffs sued for compensatory and punitive damages, alleging that on June 16, 2004, while

they were working as carpenters on Amtrak's right of way in East Haven, Connecticut, Gregory

Roberts died and Peter Quintiliani was injured as a result of Amtrak's negligence and

recklessness.  Prior to the commencement of trial in that action, Amtrak admitted that it was

negligent and that its negligence caused injuries and losses to the plaintiffs.  In so doing, Amtrak

abandoned any defenses to the plaintiff's negligence claims, including any claim that the

plaintiffs and/or O&G were negligent.  The only issues reserved for trial, as between Amtrak and

the plaintiffs, were (1) the amount of compensatory damages proximately caused by the acts of

Amtrak and (2) whether Amtrak's conduct was willful or reckless.  Amtrak's Third-Party

Complaints, both against O&G in the consolidated Roberts and Quintiliani actions and in the

present action, seek contractual defense and indemnity pursuant to section 3 of the Temporary

---

[1]      On or about August 2, 2006, the parties to this action agreed that they could rely on all of the
documentary and testimonial evidence from the consolidated Roberts and Quintiliani actions.

Permit.[2] (See Amtrak Third-Party Compl.) The jury returned a verdict on April 6, 2006, rejecting the plaintiffs' claim that Amtrak was reckless and awarding compensatory damages to the Estate of Gregory Roberts in the amount of $1.425 million and to Peter Quintiliani in the amount of $1.425 million.

After the jury returned its verdict on April 6 with regard to the plaintiffs' damages claim, the Court submitted to the jury the question of whether Amtrak breached the Temporary Permit by failing to operate its trains safely in the work site. See Roberts v. Amtrak, No. 3:04cv1318 (PCD), 2006 U.S. Dist. LEXIS 64808 (D. Conn. Sept. 11, 2006). On April 7, 2006, the jury returned a verdict finding that Amtrak breached a material term of the Temporary Permit, thereby relieving O&G from its indemnity obligation. (See Verdict Form, Apr. 7, 2006, Doc. No. 281, Case No. 3:04cv1318, Ex. F to Woolsey Decl. I.[3]) Following the verdict, Amtrak moved, pursuant to Rules 50(b) and 59(a), for judgment as a matter of law or for a new trial with respect to its contractual indemnity claims. See Roberts, 2006 U.S. Dist. LEXIS 64808.

On September 11, 2006, this Court issued a decision granting Amtrak's motion for judgment as a matter of law against O&G. See id. This Court held that the Temporary Permit's indemnification agreement obligated O&G, as a matter of law, to indemnify Amtrak for the

---

[2]     On or about October 30, 2003, Amtrak and O&G entered into a contract entitled "Temporary Permit to Enter Upon Property – W.O. 895479" (the "Temporary Permit"). Section 3 of the Temporary Permit contained an indemnification agreement. Both the Temporary Permit and the indemnification agreement will be discussed in more detail below.

[3]     James M. Woolsey, III, counsel for Amtrak, submitted a declaration in opposition to O&G's Motion for Summary Judgment with Amtrak's exhibits attached. There are three motions for summary judgment pending and Attorney Woolsey has submitted a declaration in each one. The declarations will be referred to as "Woolsey Decl. I," referring to the declaration filed in opposition to O&G's Motion for Summary Judgment [Doc. No. 33], "Woolsey Decl. II," referring to the declaration filed in support of Amtrak's Motion for Summary Judgment against Plaintiffs [Doc. No. 39], and "Woolsey Decl. III," referring to the declaration filed in support of Amtrak's Motion for Summary Judgment against O&G [Doc. No. 46].

injury and death damages awarded and the costs of defense of the claims in the <u>Roberts</u> case. <u>See</u> <u>id</u>. at *14-19. Specifically, the Court found, in view of the jury's finding that Amtrak's conduct was not willful or reckless, that the indemnification agreement applied and obligated O&G to indemnify Amtrak, based on language in the agreement providing that the right to indemnification "accrues and applies in a situation where the injury and/or death of an O&G employee is caused by the sole negligence or fault of Amtrak, its agents, servants or employees." <u>Id</u>. at *15. O&G filed a Notice of Appeal from this Court's Rulings on the Motions for Summary Judgment and Motion for Judgment as a Matter of Law. (<u>See</u> Notice of Appeal, Oct. 11, 2006, Doc. No. 332, Case No. 3:04cv1318, Ex. G to Woolsey Decl. I.) The appeal is still pending in the United States Court of Appeals for the Second Circuit.

After trial was concluded the <u>Roberts</u> and <u>Quintiliani</u> actions, Plaintiffs Fitz Vanderburgh and Maulin Vanderburgh commenced a lawsuit against Amtrak. Plaintiff Fitz Vanderburgh is suing for compensatory and punitive damages, alleging that on June 16, 2004, while he was working as a Construction Inspector on Amtrak's right of way in East Haven, Connecticut, he sustained injuries as a result of Amtrak's negligence and recklessness. (<u>See</u> Pls.' Am. Compl. ¶¶ 17-18, 20-21.) Fitz Vanderburgh's wife, Plaintiff Maulin Vanderburgh, has asserted a derivative loss of consortium claim. (<u>See</u> Pls.' Am. Compl. ¶¶ 23-24.)

### A.    The Temporary Permit

On or about October 30, 2003, Amtrak and O&G entered into a contract entitled "Temporary Permit to Enter Upon Property – W.O. 895479." (Amtrak Third-Party Compl. ¶ 9;

Temporary Permit, Ex. G to Blueweiss Decl. I.[4])  The Temporary Permit contains an

indemnification agreement which reads as follows:

> [O&G] shall defend, indemnify and hold harmless [Amtrak], its officers, directors,
> employees, agents, servants, successors, assigns and subsidiaries, irrespective of their
> negligence or fault, from and against any and all losses and liabilities, penalties,
> fines, forfeitures, demands, claims, causes of action, suits, costs and expenses
> incidental thereto (including cost of defense and attorney's fees), which any or all of
> them may hereafter incur, be responsible for, or pay as a result of injury, death,
> disease, or occupational disease to any person, and for damage . . . to or loss of any
> property, including property of [Amtrak], arising out of or in any degree directly or
> indirectly caused by or resulting from activities of or work performed by [O&G], its
> officers, employees, agents, servants, contractors, subcontractors, or any other person
> acting for or by permission of [O&G].  The foregoing obligation shall not extend to
> situations where the negligence or fault of Amtrak, its officers, directors, employees,
> agents, servants, successors, assigns or subsidiaries, is the sole causal negligence or
> fault, except that it shall so extend to injury, death, disease, or occupational disease
> to employees of [O&G], its agents, servants, contractors, subcontractors, or any other
> person acting for or by permission of [O&G].  The foregoing obligation shall not be
> limited by the existence of any insurance policy or by any limitation on the amount
> or type of damages, compensation, or benefits payable by or for [O&G] or any
> contractor or subcontractor, and shall survive the termination of this permit for any
> reason.

(Temporary Permit § 3.)

The Temporary Permit permitted O&G to enter onto Amtrak property to perform

demolition and construction work on Bridge 181, which passed over two electrified Amtrak-

owned tracks that Amtrak used for its trains.  O&G was aware that it needed to coordinate with

Amtrak before it could perform work on this project involving Amtrak's right of way.  The

Temporary Permit contained specific requirements so as "to assure that O&G would not perform

---

[4]  Jeffrey A. Blueweiss, counsel for O&G, submitted a declaration in support of O&G's Motion for
Summary Judgment with O&G's exhibits attached.  O&G is involved in two of the three pending
motions for summary judgment and Attorney Blueweiss has submitted a declaration with exhibits
attached in both.  The declarations will be referred to as "Blueweiss Decl. I," referring to the
declaration filed in support of O&G's Motion for Summary Judgment [Doc. No. 33] and
"Blueweiss Decl. II," referring to the declaration filed in opposition to Amtrak's Motion for
Summary Judgment against O&G [Doc. No. 46].

work on the overhead bridge, that could 'foul' the active Amtrak track or overhead wire." (See Amtrak's Local Rule 56(a)(1) Statement ¶ 5, Case No. 3:04cv1318, Doc. No. 91; O&G's Local Rule 56(a)(2) Statement ¶ 5, Case No. 3:04cv1318, Doc. No. 95.) In accordance with the Temporary Permit, O&G installed various protective devices, such as a demolition shield and false decking, to protect Amtrak's railroad tracks and its passing trains from falling debris and electrical interference during O&G's work on the bridge.

### B. O&G's Contract with CDOT

On or about September 19, 2003, O&G entered into a contract with the State of Connecticut Department of Transportation ("CDOT Contract"), to perform all the work and labor necessary for the New Haven Harbor Crossing Corridor Improvements – Contract C1 in East Haven, Connecticut. (CDOT Contract, Ex. B to Woolsey Decl. I.) The CDOT Contract specifies that O&G's work is subject to inspection and approval by CDOT or an authorized CDOT representative. (CDOT Contract 3.) If CDOT finds any of O&G's labor to be "defective or unsuitable," then the labor must be done again to the "satisfaction and approval" of the authorized CDOT representative at the cost and expense of O&G. (Id. at 3.)

### C. Force Account Agreement

On or about May 19, 2003, Amtrak and CDOT entered into a Force Account Agreement regarding the reconstruction of I-95 (the "I-95 Project" or the "Project") because some of the work interfered with Amtrak's existing railroad facilities. (See Force Account Agreement, May 19, 2003, Ex. N to Woolsey Decl. I.) O&G was not a party to the Force Account Agreement and is not named anywhere in the agreement. (See id.) In the Force Account Agreement, Amtrak and CDOT agreed that "there are no ascertainable net benefits to Amtrak with respect to construction

of the Project." (<u>Id</u>. ¶ 18.)  The Force Account Agreement also provides that "all parts of the work shall be subject to inspection by representatives of the parties hereto, insofar as the interests of each are concerned." (<u>Id</u>. ¶ 21.)

**D.    GM2**

At the time of the accident, Plaintiff Fitz Vanderburgh was employed by GM2 Associates, Inc. ("GM2") as a Construction Inspector.[5] (Pls.' Am. Compl. ¶¶ 6-7.)  GM2 is a professional engineering company that provides engineering and inspection services. (Gupta Dep. 16, Sept. 15, 2006, Ex. 1 to Woolsey Decl. I.)  Prior to the accident in question, GM2 entered into a subcontract agreement with Vollmer Associates, LLP ("Vollmer"), a full-service engineering company, to provide construction inspection services with respect to the work being performed relative to the I-95 Project, including work at Bridge 181. (<u>Id</u>. at 15, 17-19.)  Prior to its contract with GM2, Vollmer contracted with the CDOT to perform certain work relative to the I-95 Project, in which O&G was the general contractor (but was not a party to the Vollmer contract). (<u>Id</u>.)

Amtrak did not employ GM2, Vollmer or any other contractor to perform inspection work on its behalf with respect to O&G's work on the I-95 Project at or near Bridge 181 in the vicinity of East Haven, Connecticut. (Weed Decl. ¶ 3, Dec. 5, 2006, Ex. O to Woolsey Decl. I.[6])  Amtrak did not issue a Temporary Permit to GM2 or Vollmer to enter upon Amtrak property at or near Bridge 181 in the vicinity of East Haven, Connecticut in 2003. (Watson Decl., Dec. 8, 2006, Ex.

---

[5]    It is undisputed that Plaintiff Fitz Vanderburgh was not employed by O&G at the time of the accident, nor was his worked performed pursuant to a contract to which O&G was a party.

[6]    Craig Weed is the Director of Capital Projects for Amtrak and is familiar with the Force Account Agreement and the work performed by O&G for CDOT on the I-95 Project. (Weed Decl. ¶¶ 1-2.)

R to Woolsey Decl. I.[7])

### E.     The June 16, 2004 Accident

The subject accident occurred at or around 3:45 a.m. on June 16, 2004 when an Amtrak

diesel test train ("Test Train") collided with O&G construction equipment extended over Amtrak

railroad tracks at railroad Milepost 77.72, in the vicinity of Bridge 181, which passed over two

Amtrak-owned train tracks.  On June 15 and 16, 2004, the Test Train was involved in testing

Amtrak's Advanced Civil Speed Enforcement System ("ACSES")[8] between railroad Mileposts

86.2 and 110.7.  Locomotive engineer Keith Drewes was operating the Test Train at the time of

the subject accident.  Plaintiff's liability expert, George Gavalla, admitted during the Roberts and

Quintiliani trial that he took no exception to Engineer Drewes' operation of the Test Train on

June 16, 2004.

The Test Train departed New Haven at 8:50 p.m. on June 15, 2004.  The Test Train

completed its testing of the ACSES at approximately 3:15 a.m. and departed Old Saybrook at

approximately 3:25 a.m. on June 16, 2004.  Engineer Drewes operated the Test Train westbound

from Old Saybrook toward New Haven under signal authority.  The Test Train proceeded

westbound through a right-hand curve on track number 2 as it approached Bridge 181.  The

maximum authorized speed through the curve east of the bridge is 60 miles per hour; Engineer

Drewes operated the Test Train through the curve at 59 miles per hour.  At some point between

the curve and the O&G construction equipment, Engineer Drewes became aware of something

---

[7]     Earl Watson III is a Project Development Officer in Amtrak's Engineering Department and
conducted a search of Amtrak's records concerning issuance of Temporary Permits. (Watson Decl.
¶¶ 1, 3.)

[8]     The ACSES regulates the speed of trains and is mandated by the Federal Railroad Administration
on Amtrak's Shoreline territory.

over the tracks and blew the train's horn.  He made an emergency application of the train's brakes, but the Test Train collided with several pieces of O&G construction equipment that were over the tracks.

A crew dispatcher called Amtrak Conductor Annette Morman[9] on June 15, 2004, the day preceding the accident, and asked her to work as a flagperson in the vicinity of Bridge 181 on the evening of June 15 to June 16, 2004.  Prior to arriving at the Bridge 181 work site, Morman spoke on the phone with Amtrak Project Engineer Mark Bencivengo about the false decking work that O&G was performing that evening.  Morman testified in her deposition that she understood before she arrived at the O&G work site that O&G's false decking work would foul the railroad tracks.[10]

Morman reported for duty at Amtrak's Electrical Traction ("ET") Department trailer in the vicinity of Milepost 78.4 at approximately 10:00 p.m. on June 15, 2004.  Upon her arrival, at or around 10:00 p.m., Morman spoke with Amtrak ET Lineman Fred Scarfi at the ET trailer.  Morman testified in her deposition that Scarfi told her that he was "taking both tracks out," which she understood to mean "taking the tracks out of service, which means there would have been no train through [the] work zone."  The overhead catenary system for track number 1 was de-energized at 10:09 p.m., thus depriving an electric engine of power to move through the area.  Scarfi and ET Lineman Lee Gholson, were issued a clearance.  Scarfi and Gholson then placed

---

[9]    Morman had worked at Amtrak since May 22, 1997, and as a Conductor since January 1, 1998.  She was qualified to provide track protection for contractors and had not been disciplined during her Amtrak career prior to June 16, 2004.

[10]    The Amtrak Roadway Work Protection ("RWP") manual generally defines "fouling a track" as "the placement of an individual or equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on track equipment, or in any case, is within four feet of the field side of the near running rail."

non-fouling[11] grounding apparatus on the catenary for track number 1.[12]

Prior to and including June 16, 2004, Plaintiff was assigned to observe O&G's construction work at or near Bridge 181 on Amtrak's right of way to ensure that O&G was complying with the plans and specifications it submitted to CDOT. Prior to June 15, 2004, Plaintiff observed O&G's work on several occasions and at various locations of the Project, including observing O&G perform girder work, demolition of concrete, asphalt and concrete removal and fill and borings work in the vicinity of Bridge 181. As part of his duties as a Construction Inspector, Plaintiff completed and submitted to Vollmer Inspector's Daily Work Reports and Daily Reports of Cost Plus based upon his observations of O&G's work. (See Inspector's Daily Work Reports, Diary Summary Reports and Daily Reports of Cost Plus ("Reports"), June 1 to June 15, 2004, Ex. K to Woolsey Decl. I.) Before entering Amtrak's property, Plaintiff was required to complete Amtrak's Contractor Safety Training course, which was coordinated and initially paid for by O&G.[13] (See Training Authorization Form, Jan. 24, 2004, Ex. L to Woolsey Decl. I.; Gupta Dep. 32-35.) As a GM2 Construction Inspector, Plaintiff would have had the authority to report problems with O&G's work and would have spent between sixty and seventy percent of his time observing the contractor's, in this case, O&G's, activities. (Gupta Dep. 28-29, 43.)

---

[11] Non-fouling grounds do not foul the track over which they are applied.

[12] NORAC Operating Rule 131 provides, in relevant part, that qualified employees assigned to protect locations of railroad construction or protect contractors whose operations may affect the safe movement of trains must, when workers request permission to foul any specific track, communicate with the employee in charge of the track to secure necessary permission. NORAC rules authorize the use of foul time as a means of proving protection to roadway workers who may foul the tracks.

[13] O&G asserts that although the costs may have been advanced by O&G, the course was ultimately paid for by Plaintiff or GM2. (See O&G Local Rule 56(a)(2) Statement ¶ 27, Doc. No. 52.)

At or around the time of the accident, Plaintiff was assigned to observe O&G's false decking work taking place on the underside of Bridge 181. (Fitz Vanderburgh Dep. 170-74; Gupta Dep. 19.) Plaintiff's inspection duties were performed because, pursuant to the CDOT Contract, O&G's work had to be approved by a state representative before O&G could get paid. (Gupta Dep. 22; Rouleau Dep. 114, Sept. 28, 2005, Ex. M to Woolsey Decl. I.) In his deposition, O&G Project Superintendent John Rouleau testified that Plaintiff was working on the night of the accident "for the consultant [Vollmer] that works for CDOT," because "[y]ou cannot do any state work without a representative of the state there to document what you're doing, to see that the methods you're using are appropriate and such." (Rouleau Dep. 23, 113-14.)

According to Plaintiff's deposition testimony, at approximately 11:00 p.m. on June 15, 2004, he arrived at the O&G work site and entered onto Amtrak's right of way. Plaintiff drove his car onto Amtrak's right of way west of Bridge 181 and parked twenty to thirty feet from the bridge abutment. He proceeded to walk east, adjacent to where Scarfi and Morman were standing. Plaintiff spoke with Scarfi and Morman, and then watched, standing four or five feet away, while Morman conducted a safety meeting with the O&G workers. After the meeting, Plaintiff returned to his vehicle to review Project plans and perform some calculations; he remained there until approximately 2:00 a.m.

At approximately 11:30 p.m. on June 15, 2004, O&G's work crew reported to work in the vicinity of the bridge. Among the work O&G intended to perform that night including moving false decking within bays on the underside of the bridge. At approximately 11:30 p.m., Scarfi held a documented ET job briefing for O&G personnel concerning the de-energization of the

overhead catenary system ("OCS") for track number 1.[14]  O&G personnel understood that Scarfi

and Gholson were present at the bridge on June 15 and 16, 2004 to de-energize the catenary

system over track numbers 1 and 2.  Morman did not participate in Scarfi's job briefing, but held

a separate track safety briefing for O&G employees.  Scarfi and Gholson did not participate in

Morman's briefing.

The Job Briefing Form used during Morman's safety briefing identified Morman, as the

flagperson, as the Amtrak person responsible for providing on-track protection.  Following

Morman's safety briefing, O&G personnel went to work overhead on the bridge.  The work that

O&G initially performed did not involve fouling the tracks.

At approximately 12:12 on June 16, 2004, Amtrak passenger train 67 passed by the

bridge on track 2.  At 12:26 a.m., the Amtrak Boston Power Director de-energized the catenary

above track number 2 and issued a clearance to Scarfi.  After the OCS for track number 2 was de-

energized, Scarfi and Gholson applied non-fouling grounds to the catenary for track number 2.

They held a second ET job briefing with the O&G employees at 12:45 a.m., advising them that

the catenary for track numbers 1 and 2 were de-energized and grounded.[15]  Morman did not

participate in that job briefing.

At approximately 12:39 a.m. on June 16, 2004, Morman placed a phone call to Boston

---

[14]    NORAC Operating Rule 4 provides, in relevant part, that when reporting for duty, employees whose duties require coordination with other employees must hold a job briefing to review operational and safety conditions.  If these conditions change, employees must hold an additional job briefing to discuss the new conditions.  Generally, job briefings should be conducted face-to-face, however, when it is not practical or possible to do so, radio or telephone communications will suffice.

[15]    Rule 316 of the Amtrak RWP manual provides that "prior to performing any task, which requires fouling a track or has the potential to foul a track, all roadway workers must participate in a RWP job briefing."

Assistant Chief Dispatcher Robert McCall[16] at the Amtrak CETC Center in Boston and asked him if he knew of any extra trains that night. At the time of Morman's call, McCall was supervising eight dispatchers at eight desks who were each monitoring train movements within Amtrak's New England Division. The CETC Center is a room approximately thirty-five feet wide by seventy feet long, and contains a display board (the "CETC board") approximately sixty feet long by eight feet high, which displays trains throughout Amtrak's New England Division. McCall looked at the CETC board and advised Morman that there was a rail train near Old Saybrook and a work train that may have been cancelled. McCall also advised Morman that, as far as he knew, there were no extra ACELA passenger trains or extra moves that night. McCall testified at his deposition that he might have missed seeing the test train when he looked at the CETC board. At the time of Morman's phone call to McCall, the Amtrak Test Train was east of Old Saybrook. According to McCall's deposition testimony, Morman did not request foul time and did not tell him that any work would foul the track during their conversation. (See McCall Dep. 119-21, 187, June 29, 2005, Ex. N to Amtrak's Mem. Supp. Mot. Summ. J. against Pls.)

Dispatcher Steven Pratt was the Amtrak Dispatcher authorized to issue foul time on track numbers 1 and 2 in the vicinity of Bridge 181 between 11:30 p.m. and 3:45 a.m. on June 15 to June 16, 2004.[17] According to Pratt's deposition testimony, Morman did not contact him at any time between 11:00 p.m. on June 15, 2004 and the time of the subject accident on June 16, 2004. (See Pratt Dep. 31, June 29, 2005, Ex. O to Amtrak's Mem. Supp. Mot. Summ. J. against Pls.)

---

[16] McCall was a union member and an Amtrak "hours of service employee."

[17] Pursuant to NORAC Operating Rule 140, foul time may only be issued by the Dispatcher or, if authorized by the Dispatcher, the Operator.

McCall learned of the Amtrak Test Train on tracks in the vicinity of Old Saybrook, Connecticut after his telephone conversation with Morman. The Old Saybrook track area is in the vicinity of Milepost 110.7 and is approximately thirty miles from Bridge 181 at Milepost 77.72. Because the ACSES Test Train was unscheduled train, it had no designated time to complete its testing or to proceed to New Haven. McCall did not advise Pratt, whose desk was a few feet from McCall's, of his phone call with Morman or of the presence of the Test Train.

Plaintiff Fitz Vanderburgh testified at his deposition that at approximately 2:00 a.m., he left his vehicle and walked east to a position adjacent to a concrete pier supporting Bridge 181, approximately forty feet from the tracks. According to Plaintiff, he remained by the pier observing the O&G workers until the time of the accident. O&G Foreman Scott Rouleau testified that between approximately 2:15 a.m. and 3:45 a.m., he was in O&G manlift number 1 in the vicinity of track number 1 moving false decking in the bays below the bridge. At approximately 3:15 a.m., O&G workers Gregory Roberts and Peter Quintiliani got into an O&G manlift and positioned it so the boom of the lift extended through the columns of the bridge. They extended the boom toward track number 2 and began to reposition the false decking in the bays of the bridge.

During the time that the O&G crew was working in the vicinity of Bridge 181 on June 15 and 16, 2004, Morman was at the worksite, however, she did not obtain foul time for track numbers 1 and 2 in the vicinity of the bridge. Morman testified in her deposition that she first became aware that the Test Train was traveling in the direction of the bridge when she heard a hot box detection transmission over her portable radio. She was standing by her Amtrak vehicle, approximately 100 to 150 feet east of the bridge, when she heard the hot box transmission.

When Morman heard the hot box transmission, she attempted to warn the O&G workers to clear the tracks by running toward the tracks and yelling "train."

Scarfi exited his Amtrak vehicle approximately twenty to thirty feet from Morman's vehicle and saw Morman running toward the tracks. Scarfi estimated that approximately forty-five seconds elapsed from the time Morman exited her truck and began to run toward the bridge and the time the diesel-powered Test Train, independent of the de-energized catenary, collided with the O&G equipment. Scarfi yelled "emergency" into the radio in his truck and then ran after Morman toward the tracks as the train reached the bridge. Plaintiff testified that he heard the train horn before the accident and took "two or so" steps in the direction of the tracks when he heard the horn. Plaintiff further testified that he was "in shock" and "frozen" after the accident. (Fitz Vanderburgh Dep. 182-84.) He turned to run and was struck by a piece of debris on his left foot and on his hard hat. He fell into the concrete abutment and was knocked unconscious. (Id. at 184-85.)

Following the accident, Amtrak investigated the accident and the circumstances under which it occurred. Amtrak's investigation revealed that Morman failed to fully comply with Amtrak's foul time procedures. After a disciplinary hearing, Morman was terminated as an Amtrak conductor. No other Amtrak employee was disciplined.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is

therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 255. When moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." The nonmoving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party." Anderson, 477 U.S. at 249. In making this determination, the court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of the adverse party's pleading." FED. R. CIV. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

III.    **DISCUSSION**

   A.    **O&G's Motion for Summary Judgment against Amtrak [Doc. No. 33] &**
          **Amtrak's Motion for Summary Judgment against O&G [Doc. No. 46]**

      1.    Whether O&G is Barred by Collateral Estoppel from Litigating Issues
            Determined in the Prior Actions

Under the doctrine of collateral estoppel, or issue preclusion, parties or their privies are prevented from "relitigating in a subsequent action an issue of fact or law that was fully and

fairly litigated in a prior proceeding." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288 (2d

Cir. 2002); see also Cumberland Farms, Inc. v. Groton, 262 Conn. 45, 58 n.17, 808 A.2d 1107

(2002) (holding that the doctrine of collateral estoppel "precludes a party from relitigating issues

and facts actually and necessarily determined in an earlier proceeding between the same parties

or those in privity with them upon a different claim") (citation omitted).  Collateral estoppel

applies, and an issue cannot be relitigated, when: "(1) the identical issue was raised in a previous

proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the

party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was

necessary to support a valid and final judgment on the merits." Marvel Characters, 310 F.3d at

288-89 (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)); see also Delahunty

v. Mass. Mut. Life Ins. Co., 236 Conn. 582, 600, 674 A.2d 1290 (1996) ("For an issue to be

subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also

must have been actually decided and the decision must have been necessary to the judgment.")

(citation omitted).  This Court's rulings on the motions for summary judgment and the motion for

judgment as a matter of law in the Roberts case are on appeal, however, "in the federal courts the

general rule has long been recognized that while appeal with proper supersedeas stays execution

of the judgment, it does not—until and unless reversed—detract from its decisiveness and

finality." Huron Holding Corp. v. Lincoln Mine Operating Co., 312 U.S. 183, 189, 61 S. Ct. 513,

85 L. Ed. 725 (1941); see also Raitport v. Commercial Banks, 391 F. Supp. 584, 586 (S.D.N.Y.

1975) ("pendency of an appeal does not detract from the finality of the judgment"); Wyngate,

Inc. v. Bozak, Inc., 40 Conn. Supp. 53, 55, 480 A.2d 616 (1984) ("Where judgment is on appeal,

it is still deemed final until reversed, since the finality of a judgment is determined by the court

rendering the judgment.").

*a.* *Whether the Indemnification Agreement is Enforceable*

O&G argues that the indemnification agreement violates Conn. Gen. Stat. § 52-572k, which provides in relevant part:

> Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer.

Conn. Gen. Stat. § 52-572k(a). In its Ruling on O&G's motion for summary judgment on Amtrak's contractual indemnification claim in the Roberts case, this Court rejected O&G's argument that the indemnification agreement is voided by Conn. Gen. Stat. § 52-572k, finding that § 52-572k is preempted by 49 U.S.C. § 28103(b). See Roberts v. Amtrak, No. 3:04cv1318 (PCD), 2006 U.S. Dist. LEXIS 13825, at *20-37 (D. Conn. Mar. 9, 2006).

It is indisputable that the prior Roberts action involved the same relevant parties, i.e., Amtrak and O&G, that the issue of whether the indemnification agreement violates § 52-572k was raised, litigated and decided, that the parties had a full and fair opportunity to litigate the issue and that the resolution of the issue was necessary to support a valid and final judgment on the merits. See Marvel Characters, 310 F.3d at 288-89. Therefore, O&G's argument that the indemnification agreement violates Conn. Gen. Stat. § 52-572k is barred by collateral estoppel.

*b.* *Interpretation of the Indemnification Agreement*

O&G argues that Amtrak is not entitled to contractual indemnity due to its failure to

prevent its train from passing through the O&G work site on June 16, 2004. In its Ruling on

Amtrak's Motion for Judgment as a Matter of Law in the Roberts case, this Court held, as a

matter of law, that Amtrak's negligence and/or fault cannot be relied on by O&G to relieve O&G

of its indemnity obligation when the injury is to "to employees of [O&G], its agents, servants,

contractors, subcontractors, or any other person acting for or by permission of [O&G]." See

Roberts v. Amtrak, No. 3:04cv1318 (PCD), 2006 U.S. Dist. LEXIS 64808, at *14-20 (D. Conn.

Sept. 11, 2006). For the same reasons as those set forth above, any argument to the contrary is

barred by collateral estoppel. The question of whether the indemnification agreement applies to

the facts of this case, however, has not been litigated. Therefore, the only remaining issue

between Amtrak and O&G is whether Plaintiff's claims are covered by the language in the

indemnification agreement.

### 2. Whether the Indemnification Agreement Applies to this Case

In the consolidated Roberts and Quintiliani actions, this Court held, in its Ruling on

Amtrak's Motion for Judgment as a Matter of Law, that the indemnification agreement applied

and obligated O&G to indemnify Amtrak for the injury and death damages awarded to Plaintiffs

and for the costs of defense of the claims. See Roberts v. Amtrak, No. 3:04cv1318 (PCD), 2006

U.S. Dist. LEXIS 64808, at *14-20 (D. Conn. Sept. 11, 2006). This holding was based in part on

the undisputed fact that the plaintiffs in the Roberts and Quintiliani actions were employees of

O&G. Under the Temporary Permit, Amtrak is entitled to defense and indemnity protection from

O&G "from and against any and all . . . claims . . . as a result of injury . . . arising out of or in any

degree directly or indirectly caused by or resulting from activities of or work performed by

[O&G] . . . or any other person acting for or by permission of [O&G]." This provision applies

even where "the negligence or fault of Amtrak . . . is the sole causal negligence or fault" when the injury is to "employees of [O&G], its agents, servants, contractors, subcontractors, or any other person acting for or by permission of [O&G]." (Temporary Permit § 3.)  In other words, if an employee of O&G or its agents, servants, contractors, subcontractors or any other person acting for or by permission of O&G is injured, O&G is obligated to indemnify Amtrak even where Amtrak's negligence or fault is the sole cause of the injury.  It is undisputed that Plaintiff is not an employee of O&G; the issue presented here is whether Plaintiff, at the time of the accident, was a person "acting for or by permission of" O&G within the meaning of the indemnification provision.

Amtrak's argument that Plaintiff was "acting for or by permission of" O&G is without merit.  At the time of the subject accident, Plaintiff was employed by GM2 as a Construction Inspector.  Plaintiff was on Amtrak property as a representative of the State of Connecticut. (See Gupta Dep. 22; Rouleau Dep. 114.)  Specifically, he was there because CDOT entered into a contract with Vollmer, pursuant to which Vollmer was to perform work relative to the I-95 Project, and Vollmer subsequently entered into a subcontract with GM2, pursuant to which GM2 was to provide construction inspection services for the I-95 contract.  Neither Plaintiff nor GM2 had any contractual relationship with O&G.  The State of Connecticut was responsible for arranging for the presence of GM2 or Vollmer at the worksite; O&G had no control or right to control whether Plaintiff, GM2 or Vollmer would be at the worksite or the means or methods used by them to perform their work. (See Gemetro Aff. ¶ 14, Nov. 17, 2006, Ex. I to Blueweiss

Decl. I.[18]) Plaintiff was on Amtrak property at the time of the subject accident because CDOT arranged for him to be. The situation is, in effect, no different from a situation in which a CDOT engineer came to the site and inspected O&G's work. Plaintiff's situation is only two steps removed—he is working for and on behalf of CDOT, albeit through a subcontract.

Therefore, this Court finds that Plaintiff was not "acting for or by permission of" O&G at the time of the subject accident. Accordingly, the indemnification agreement does not apply if "the negligence or fault of Amtrak, its officers, directors, employees, agents, servants, successors, assigns or subsidiaries, is the sole causal negligence or fault" of Plaintiff's injuries. (Temporary Permit § 3.) Because Amtrak has admitted that it was negligent and that its negligence was the cause of the subject accident, the indemnification agreement does not apply and O&G is not obligated to defend Amtrak in this action nor to indemnify Amtrak for any sums it shall be obligated to pay Plaintiffs in this action. Accordingly, O&G's Motion for Summary Judgment is granted.

### 3. O&G's Breach of Contract Claim

O&G asserts a breach of contract claim in a counterclaim filed against Amtrak. (See O&G Counterclaim ¶¶ 5-9, Oct. 19, 2006, Doc. No. 23.) In its counterclaim, O&G argues that Amtrak breached its duties under the Temporary Permit when it "dispatch[ed], operat[ed] and allow[ed] a train to enter O&G's work zone without any prior warning or notice whatsoever." (Id. ¶ 8.) O&G contends that it has been damaged by Amtrak's breach of contract and requests that Amtrak's third-party complaint be dismissed and that O&G be awarded all attorneys' fees

---

[18]     John Gemetro, Jr. is presently employed as Vice President of O&G and was employed by O&G in that capacity on June 15 and 16, 2004, at the time of the subject accident.

and costs incurred in defending this and the prior actions as well as compensatory and punitive damages. (Id. ¶ 9.)

At the conclusion of the Roberts trial, on April 7, 2006, the jury returned a verdict finding that Amtrak breached a material term of the Temporary Permit, thereby relieving O&G from its indemnity obligation. (See Verdict Form, Apr. 7, 2006, Doc. No. 281, Case No. 3:04cv1318, Ex. F to Woolsey Decl. I.) Amtrak subsequently filed a motion for judgment as a matter of law. In granting Amtrak's Motion for Judgment as a Matter of Law, this Court noted that the language of the Temporary Permit was unambiguous, and held that "[t]he fact that Amtrak was obliged to operate its trains safely, and thereby to protect the O&G work site and its employees there engaged, was not creative of a condition on the right to indemnification." Roberts v. Amtrak, No. 3:04cv1318 (PCD), 2006 U.S. Dist. LEXIS 64808, at *14-15 (D. Conn. Sept. 11, 2006). The Court considered O&G's argument regarding Amtrak's alleged breach of contract and found that:

> Amtrak failed to operate trains safely and caused injury to and death of O&G employees, a factual scenario squarely within and described by the Permit provision in which O&G agreed to indemnify and hold harmless Amtrak. To sustain O&G's argument would render the indemnification provision meaningless. The right vested in Amtrak presupposes negligence or fault on its part. O&G's argument that such negligence or fault constituted a material breach of Amtrak's duty to O&G and its employees disregards the indemnification language, which extends to Amtrak protection from being ultimately liable for any such negligence or fault. If Amtrak's breach of its duty to operate its trains safely allows O&G to avoid indemnification, Amtrak's protection against ultimate responsibility for any unsafe train operation, as provided in the permit, would be nullified.

Id. at *17. O&G's breach of contract argument has been litigated and decided by this Court in a final judgment on the merits and therefore is barred by collateral estoppel. Amtrak is entitled to summary judgment on O&G's third-party counterclaim.

**B.     Amtrak's Motion for Summary Judgment against Plaintiffs [Doc. No. 39]**

Plaintiffs' Amended Complaint alleges that "Amtrak and its officers, managers, supervisors, and/or employees willfully or recklessly endangered the life of the plaintiff and caused his injuries," and claims that Plaintiff is entitled to punitive damages as a result of this conduct. (Pls.' Am. Compl. ¶¶ 20-21.) Amtrak argues that it is entitled to summary judgment on Plaintiffs' claim for punitive damages, asserting that Plaintiff has failed to prove that its conduct rose to the level required under Connecticut law for an award of punitive damages.

1.    Punitive Damage Standard

Punitive damages are awarded under Connecticut law "when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." Alaimo v. Royer, 188 Conn. 36, 42-43, 448 A.2d 207 (1982) (quoting Vandersluis v. Weil, 176 Conn. 353, 358, 407 A.2d 982 (1978)).[19] Connecticut courts have set forth definitions of the terms reckless, willful and wanton to assist courts in determining whether conduct rises to a level sufficient to justify an award of punitive damages:

> Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . .
>
> While we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing. The result is that willful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary

---

[19]    If punitive damages are awarded, they are limited to the cost of litigation less taxable costs. Label Sys. Corp. v. Aghamohammadi, 270 Conn. 291, 335-36, 852 A.2d 703 (2004); Vandersluis, 176 Conn. at 358.

care, in a situation where a high degree of danger is apparent. . . . It is at least clear
. . . that such aggravated negligence must be more than any mere mistake resulting
from inexperience, excitement, or confusion, and more than mere thoughtlessness or
inadvertence, or simply inattention.

Craig v. Driscoll, 262 Conn. 312, 342-43, 813 A.2d 1003 (2003) (quoting Craig v. Driscoll, 64

Conn. App. 699, 720-21, 781 A.2d 440 (2001) (citations and internal quotation marks omitted)).

Corporations can be held liable for their actions in punitive damages, however, punitive

damages cannot be awarded against a corporation or principal where its liability is based solely

on a theory of respondeat superior or vicarious liability. Maisenbacker v. Society Concordia, 71

Conn. 369, 379-80, 42 A. 67 (1899).  Under Connecticut law, "no recovery of exemplary [or

punitive] damages can be had against a principal for the tort of an agent or servant, unless the

defendant expressly authorized the act as it was performed, or approved it, or was grossly

negligent in hiring the agent or servant." Id. at 380 (citation omitted); see also Larsen Chelsey

Realty Co. v. Larsen, 232 Conn. 480, 505, 656 A.2d 1009 (1994) ("In order to find that a

corporation has committed an intentional act, a court or jury must find that the corporation

committed, directed or ratified the intentional act.") (citation omitted).  Ratification, for purposes

of this analysis, is defined as "the affirmance by a person of a prior act which did not bind him

but which was done or professedly done on his account." Russell v. Dean Witter Reynolds, Inc.,

200 Conn. 172, 185, 510 A.2d 972 (1986) (quoting RESTATEMENT (SECOND) OF AGENCY § 82

(1958)).  "Ratification requires 'acceptance of the results of the act with an intent to ratify, and

with full knowledge of all the material circumstances.'" Id. (quoting Ansonia v. Cooper, 64

Conn. 536, 544, 30 A. 760 (1894)).  "Silence, as well as affirmative acts, may imply an intent to

ratify." Hartford Acci. & Indem. Co. v. South Windsor Bank & Trust Co., 171 Conn. 63, 72, 368

A.2d 76 (1976). Connecticut law also authorizes the award of punitive damages against a corporation for the acts of high-ranking managerial employees. 12 Conn. Prac., Unfair Trade Practices § 6.11; see also Pirre v. Printing Developments, Inc., 468 F. Supp. 1028, 1038-39 (S.D.N.Y. 1979) ("we believe that Connecticut, like New York, would allow punitive damages to be assessed against a corporation for the acts of its high-ranking managerial employees").

Amtrak concedes that Morman negligently performed her duties, but argues that it dealt with Morman appropriately by terminating her following an investigation and a disciplinary hearing. Amtrak argues that Morman's errors were not reckless, willful or wanton, and does not concede that any other employee's conduct was negligent and/or reckless, willful or wanton. Amtrak also argues that there is no evidence that a high-ranking official engaged in or approved of reckless, willful or wanton misconduct. Plaintiffs set forth the disputed issues of material fact regarding Amtrak's alleged recklessness: (1) whether the conduct of Amtrak supervisors in failing to implement the revised job briefing form, in instructing employees not to conduct joint job briefings, and in failing to conduct field efficiency testing of Morman rises to the level of recklessness; (2) whether the conduct of Amtrak Assistant Chief Dispatcher McCall, in providing Morman with false and misleading information and subsequently failing to correct that misleading information, rises to the level of recklessness; (3) whether Amtrak's conduct regarding these and other issues, when viewed in its entirety, rises to the level of recklessness; and (4) whether the express approval of every Amtrak employee's conduct, other than Morman, by Frederick Fournier, Amtrak's highest manager in charge of Operations in the New England region, constitutes ratification.

1.      Prior Rulings on Punitive Damages

The Court considered these same issues in the prior <u>Roberts</u> and <u>Quintiliani</u> actions. In those prior actions, this Court denied Amtrak's motion for summary judgment on the plaintiffs' punitive damages claims, holding that:

> Plaintiffs have proffered evidence regarding Amtrak's, and not solely Morman's, allegedly reckless conduct. Plaintiffs have therefore established the presence of genuine issues of material fact as to whether Amtrak acted recklessly and whether its conduct "involved a risk to others which is substantially greater than that which is necessary to make . . . [its] conduct negligent." <u>See</u> <u>Matthiessen v. Vanech</u>, 266 Conn. 822, 831, 836 A.2d 394 (2003). Because a jury could properly award punitive damages if it determined that Amtrak acted recklessly, <u>see</u> <u>id.</u>, it would not be appropriate to summarily exclude the issue from the jury's consideration.

<u>Roberts v. Amtrak</u>, No. 3:04cv1318 (PCD), 2006 U.S. Dist. LEXIS 13825, at *18 (D. Conn. Mar. 9, 2006). The jury, in a verdict returned on April 6, 2006, awarded compensatory damages to both plaintiffs, but found that Amtrak was not reckless and therefore, that the plaintiffs were not entitled to punitive damages. Following the verdict, plaintiff Roberts filed a motion for a new trial, arguing, *inter alia*, that the jury's determination that Amtrak was not reckless was so against the weight of the evidence that it is seriously erroneous or a miscarriage of justice. This Court denied the motion for a new trial, holding that:

> Because the question of what degree of fault would apply to Amtrak's conduct, beyond the admitted negligence, was one of fact for a jury to decide, because Plaintiffs bore the burden of proof on the issue, and because the facts cannot be said to sustain only a finding of recklessness on the part of Amtrak, the jury's rejection of the claim for punitive damages must stand.

<u>Roberts v. Amtrak</u>, No. 3:04cv1318 (PCD), 2006 U.S. Dist. LEXIS 38565, at *10 (D. Conn. May 31, 2006). Judgment was entered for Plaintiffs in the amount of the jury's compensatory damage award, and the Roberts judgment is now on appeal to the Second Circuit Court of Appeals.

3.     <u>Application of Standard to Facts of this Case</u>

In this action, as in the prior action, the question of whether Amtrak's conduct was reckless is a question of fact for the jury to decide. Plaintiffs have put forth evidence which, when viewed in the light most favorable to the plaintiff, establishes a genuine issue of material fact as to whether Amtrak, and not just Morman, acted recklessly, based either on its own conduct or on its ratification of any employee's reckless conduct. Because a reasonable jury could find, on the facts alleged by Plaintiff, that Amtrak acted recklessly and award punitive damages, summary judgment is improper.

As in the prior actions, Amtrak argues here that Plaintiffs may not rely on expert testimony by Plaintiffs' liability expert, George Gavalla, consisting merely of conclusory opinions of ultimate fact. Amtrak is correct that expert testimony which is not helpful to the trier of fact or which states a legal conclusion is generally not admissible at trial. See Fed. R. Evid. 701, 702; United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994). In this case, however, Plaintiffs rely heavily on the testimony of Amtrak workers and various Amtrak rules and regulations and only peripherally on the testimony of their expert. Therefore, Amtrak's argument, although legally sound, does not warrant judgment in its favor on the question of punitive damages. The issue of whether Gavalla's testimony is admissible at trial need not be resolved at this time.

## IV.    CONCLUSION

For the foregoing reasons, O&G's Motion for Summary Judgment [Doc. No. 33] is **granted**, Amtrak's Motion for Summary Judgment against Plaintiffs [Doc. No. 39] is **denied**, and Amtrak's Motion for Summary Judgment against O&G [Doc. No. 46] is **granted in part and denied in part**. Moreover, Amtrak and O&G's Motions to Expedite consideration of the

28

summary judgment motions [Doc. Nos. 54, 55, 62] are **granted**.

SO ORDERED.

Dated at New Haven, Connecticut, February  16 , 2007.

_____
/s/
Peter C. Dorsey, U.S. District Judge
District of Connecticut